UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JESSE CRUZ,<br><br>　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>SETON HALL UNIVERSITY, ABC CORPS. 1-5, ALEXANDRA BAN DYK, YOSAYRA EUSEBIO, TARA HEART, JANE DOES 1-5, JOHN DOES 1-5,<br><br>　　　　　　　　Defendants. | Civil Action No. 11-1429 (SDW) (MCA)<br><br><br>**OPINION**<br><br><br>July 10, 2012 |

**WIGENTON**, District Judge.

　　　Before the Court is Defendants Seton Hall University ("SHU"), Alexandra Bandyk[1] ("Bandyk"), Yosayra Eusebio ("Eusebio") and Tara Hart's ("Hart") (collectively "Defendants") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(a) ("Motion"). This Court has jurisdiction pursuant to 28 U.S.C. § 1331. Venue is proper in this District pursuant to 28 U.S.C. § 1391. For the reasons stated below, this Court grants Defendants' Motion.

**FACTUAL AND PROCEDURAL HISTORY**

　　　At the time of the events leading up to this cause of action, Jesse Cruz ("Plaintiff" or "Cruz"), an openly homosexual male, was a student at SHU. (Nicholas Decl. Ex. A, Cruz Certification ("Certif.") ¶ 3.) On August 25, 2010,[2] Plaintiff applied for on-campus housing for the 2010-2011 school term. (Compl. ¶ 12.) SHU's housing application and residence life form

---

[1] Bandyk is incorrectly pled as Ban Dyk. Hart is also incorrectly pled as Heart. (Defs.' Notice of Mot. 1.)
[2] Cruz's subsequent certification, however, states that he applied for housing on August 27, 2010. (Nicholas Decl. Ex. A, Cruz Certif. ¶ 4.)

did not inquire about Plaintiff's sexual orientation or sexual preference. (Sponzilli Decl. Ex. A, Cruz Dep. 21:19-21.) On August 30, 2010, SHU assigned Cruz to room 346 in Xavier Hall. (Nicholas Decl. Ex. A, Cruz Certif. ¶¶ 5-6; Compl. ¶ 14.) On that same date, Cruz met his roommate Anthony Crisci ("Crisci"), who was already residing in the room. (Nicholas Decl. Ex. A, Cruz Certif. ¶ 7.) Within twenty minutes of meeting, Crisci informed Cruz that "he wanted to room with someone else." (Sponzilli Decl. Ex. A, Cruz Dep. 47:2-10.) Thereafter, Crisci emailed Eusebio, Xavier Hall's Residence Director, stating that he wanted to room with someone else. (Hart Decl. Ex. B at SHU00005-6.) Following that email, Cheryl Janus, SHU's Assistant Director of Housing Services, informed Crisci that he had to follow normal protocol and wait until September 15 for "room change day." (Hart Decl. Ex. D at SHU00010.)

The next day, Cruz moved into room 346. (Sponzilli Decl. Ex. A, Cruz Dep. 55:13-25, 64:24-65:10.) That same day, Crisci discovered, through Plaintiff's Facebook profile, that Plaintiff was homosexual. (Hart Decl. Ex. E at SHU00008.) Subsequently, Crisci's mother informed SHU that her son "wanted a room change because his roommate identified himself as gay on Facebook [and that] ma[de] [him] uncomfortable." (Id.) SHU denied the request. (Id.)

On September 15, 2010, Cruz and Crisci exchanged several text messages. Crisci expressed that he wanted Cruz to move out of the room so that one of Crisci's friends could move in. (Sponzilli Decl. Ex. B at JC-1.) Cruz responded that he had no desire to move out, but Crisci could move out if he wanted to. (Id. at JC-1, JC-2.) Crisci then offered to give money and assistance to Cruz if he moved out of the room. (Id. at JC-2-JC-3; Sponzilli Decl. Ex. A, Cruz Dep. 106:10-17.) Subsequently, Cruz contacted Dawn Ohanessian ("Ohanessian"), Assistant Director of Housing and Residence Life, about the text messages. (Hart Decl. Ex. H.) Ohanessian emailed Eusebio to set up a meeting with Crisci and to contact Cruz "to see how he's

2

doing." (Id.)  Plaintiff testified that he did not stay in his room for the next few days because he "felt awkward . . . [t]hat [Crisci] wanted [him] to leave.  [He also] felt that [it] was awkward to be in the room with him at that point."  (Sponzilli Decl. Ex. A, Cruz Dep. 92:23-93:5.)

On September 16, 2010, Eusebio met separately with both Cruz and Crisci and gave them three options: (1) "[t]hey both move to a vacancy in the Complex;" (2) switch with two international students from China who want to live with American roommates; or (3) "[o]ne of them chooses to move to a vacancy in the Complex."  (Hart Decl. Ex. K at SHU00035-36.)  According to a memo recording the meeting between Eusebio and Cruz, Cruz was amenable to moving out of the room as long as Crisci moved out as well.  (Hart Decl. Ex. I.)  However, Cruz denies ever agreeing to move out.  (Sponzilli Decl. Ex. A, Cruz Dep. 116:7-17.)

Subsequently, Crisci attempted to contact Cruz to inform him that he changed his mind about getting a new roommate and that he wanted to make amends.  (Hart Decl. Ex. L at SHU00042.)  Cruz concedes that he received Crisci's messages but did not reply to them.  (Sponzilli Decl. Ex. A, Cruz Dep. 97:21-98:5.)  In addition, Crisci emailed Eusebio the following: "I have thought it over and I am not willing to move out of Xavier.  I am willing to make this work with [Cruz] for the rest of the year.  I have tried to contact him this morning and he has yet to respond."  (Hart Decl. Ex. L at SHU00042.)

Cruz, on the other hand, did not tell Eusebio or Hart which option he would pursue.  Consequently, Eusebio emailed Cruz and informed him that pursuant to SHU's Housing Terms and Conditions of License Agreement, both he and Crisci would be assigned to separate rooms and that he "ha[d] until Sunday, September 19, 2010 at 10:00pm to complete the move."  (Hart Decl. Ex. M at SHU00050.)  Four minutes after that email, Cruz responded: "I am not moving, I don't think that's in my best interest.  I am seeking legal representation on this matter."  (Hart

3

Decl. Ex. M at SHU00049.)  On September 17, 2010, Cruz's attorney sent a letter to Eusebio asserting that she represented Cruz and that "[a]ny attempt to remove [him] from his current room assignment will be met with an immediate LAD lawsuit."  (Hart Decl. Ex. N.)  On September 21, 2010, Cruz returned to the room after Crisci vacated it.  He never moved out of the room.  (Sponzilli Decl. Ex. A, Cruz Dep. 141:22-25.)

On March 14, 2011, Plaintiff commenced this action asserting that Defendants violated the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. ("LAD"), Title IX, 20 U.S.C. § 1681, et seq., the New Jersey Fair Housing Act ("NJFHA"), N.J.S.A. 52:27D-301, et seq., and the United States Fair Housing Act ("FHA"), 42 U.S.C. § 3601, et seq.  Cruz also asserts claims for breach of housing contract, negligent hiring, training, supervision and retention, and negligent and intentional infliction of emotional distress.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law."  Id. at 248.  A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations, unsupported assertions or denials of its pleadings. Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005) (quoting Celotex Corp., 477 U.S. at 325). Further, the nonmoving party is required to "point to concrete evidence in the record which supports each essential element of its case." Black Car Assistance Corp. v. New Jersey, 351 F. Supp. 2d 284, 286 (D.N.J. 2004). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof," then the moving party is entitled to judgment as a matter of law. Celotex Corp., 477 U.S. at 322-23.

**DISCUSSION**

    **1. Discrimination Based on Sexual Orientation under LAD**

The LAD provides in relevant part: "All persons shall have the opportunity to . . . obtain all the accommodations, advantages, facilities, and privileges of any place of public

5

accommodation . . . without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation . . . . This opportunity is recognized as and declared to be a civil right." N.J. Stat. Ann. § 10:5-4. New Jersey courts have adopted the Supreme Court's analysis in anti-discrimination statutes when analyzing claims under LAD. Grigoletti v. Ortho Pharm. Corp., 118 N.J. 89, 97 (1990). Consequently, New Jersey applies the burden-shifting test espoused in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The McDonnell Douglas framework is a three-step process where:

> (1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the defendant then must show a legitimate non-discriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application.

Lolagne v. Sears, Roebuck & Co., Civ. A. No. 04-3768, 2006 U.S. Dist. LEXIS 3468, *9 (D.N.J. 2006) (internal citation omitted). While discrimination must be intentional, the plaintiff may prove the defendant's intent to discriminate by either direct or indirect circumstantial evidence. Greenberg v. Camden Cnty. Vocational & Technical Sch., 310 N.J. Super. 189, 198 (App. Div. 1998); see also Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981) (stating that a plaintiff may prove discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence").

Plaintiff's claim fails for two reasons. First, SHU is exempt from the LAD's provisions under N.J. Stat. Ann. § 10:5-5(l), which provides: "nor shall anything herein contained apply to any educational facility operated or maintained by a bona fide religious or sectarian institution." In Romeo v. Seton Hall University, the New Jersey Appellate Division observed that "[i]t is not

disputed that Seton Hall qualifies as an education facility operated by a bona fide religious institution." 378 N.J. Super. 384, 389 (App. Div. 2005), certif. denied, 185 N.J. 295 (2005). Consequently, the court concluded that "by its very terms[,] the provisions of LAD, including the prohibition of discrimination based on sexual orientation, do not apply to such religiously affiliated institutions." Id.

Plaintiff's claim that SHU waived the statutory exemption because its License Agreement provides that "students are assigned to roommates without regard to . . . sexual orientation," (Pl.'s Opp'n Br. 10), lacks merit. The New Jersey Supreme Court looks to Title VII case law "for guidance in developing standards to govern the resolution of LAD claims." Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 631 (1995). The Third Circuit discussed the waiver of the religious exemption in the Title VII context in Little v. Wuerl, 929 F.2d 944 (3d Cir. 1991). There the court observed:

> We recognize that Congress intended Title VII to free individual workers from religious prejudice. But we are also persuaded that Congress intended the explicit exemptions to Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices . . . . Against this background and with sensitivity to the constitutional concerns that would be raised by a contrary interpretation, we read the exemption broadly.

Id. at 951. The Third Circuit then concluded that "[o]nce Congress stated that '[t]his title shall not apply' to religiously-motivated employment decisions by religious organizations, no act by [the plaintiff] could expand the statute's scope." Id. (internal citations omitted); see also Hall v. Baptist Memorial Health Care Corp., 215 F.3d 618, 625 (6th Cir. 2000) ("[T]he statutory exemptions from religious discrimination claims under Title VII cannot be waived by either party."). Following the Third Circuit's reasoning, the Romeo Court held that "[c]ases such as

7

<u>Little</u> persuade us to conclude that the exemption . . . of the LAD cannot be waived." <u>Romeo</u>, 378 N.J. Super. at 391.

Second, Plaintiff has failed to establish a *prima facie* case of discrimination. Plaintiff asserts that Defendants[3] reassigned him to another room because he is a homosexual. (Pl.'s Opp'n Br. 9.) Cruz does not dispute that SHU "[r]eserve[d] the right[, under its License Agreement] to move a Resident from one room to another when . . . [it] determines, in its sole and absolute discretion that the move is in the Resident's best interest or those of his/her fellow students and/or the University's." (Hart Decl. Ex. A ¶ 6.) In fact, Cruz acknowledges that the memo recording his September 16 meeting with Eusebio noted that both he and his roommate would be moved if they were unable to resolve the conflict. (Sponzilli Decl. Ex. A, Cruz Dep. 115:15-116:6.) Therefore, SHU had the right to move Cruz and his roommate out of the room.

Additionally, Plaintiff's assertion that Eusebio discriminated against him because she told his cousin Zoimara that he cannot "play the gay card," (Sponzilli Decl. Ex. A, Cruz Dep. 227:24-228:5), also lacks merit. Asserting that an individual cannot "play the gay card" alone is not evidence of discriminatory conduct. The record indicates that Eusebio attempted to resolve the conflict, had several discussions with both Plaintiff and Crisci and took steps to ensure Plaintiff's safety and welfare. For instance, Eusebio offered Plaintiff an escort to his room when he indicated that he felt uncomfortable going there with Crisci in the room. (<u>Id.</u> at 111:18-120:25, 134:24-136:5.) Moreover, Plaintiff asserts that Eusebio informed him during his September 16 meeting with her that "Crisci should not win and get his way." (<u>Id.</u> at 113:6-115:4.) Cruz also admits that the memo recording his meeting with Eusebio notes that his roommate could not force him out of the room. (<u>Id.</u> at 103:1-8.) Most importantly, although

---

[3] Cruz concedes that Bandyk and Hart did not discriminate against him. (Sponzilli Decl. Ex. A, Cruz Dep. 228:9-14.) Therefore, Plaintiff has no claim against those defendants.

SHU instructed Cruz to vacate the room, he never actually did. (Sponzilli Decl. Ex. A, Cruz Dep. 141:7-8.) Additionally, Plaintiff was given three options to choose from and he failed to inform Defendants which option he would pursue. As a result, SHU could exercise its discretion under the License Agreement. The record shows that Defendants' decision to move Cruz and Crisci to different rooms was based solely on their inability to resolve the conflict.

Nonetheless, Plaintiff claims that he was "constructively evicted." (Pl.'s Opp'n Br. ¶¶ 23-24 at 6.) Cruz contends that although Defendants "did not physically force [him] to sleep somewhere else, they intentionally made [him] feel so alienated and [made it] uncomfortable for him to sleep in his originally assigned room." (Id. at 10.) Plaintiff also asserts that SHU changed his residence from Xavier Hall to Serra Hall on the school's website and that change amounts to an eviction. (Id. at 11.) Cruz's constructive eviction claim lacks merit. As stated earlier, Cruz never actually moved out of his originally assigned room. In addition, Plaintiff concedes that it was his decision not to stay in the room from September 15, 2010 to September 19, 2010. (Id. ¶¶ 9, 10 at 1-2; Sponzilli Decl. Ex. A, Cruz Dep. 124:9-13, 195:1-6.) He also testified that he did not tell Eusebio that he felt threatened. (Sponzilli Decl. Ex. A, Cruz Dep. 116:24-117:24.) Overall, Plaintiff has not offered any evidence demonstrating that Defendants actually removed him from his dormitory or that their decision was based on his sexual orientation. Therefore, Plaintiff fails to establish a *prima facie* case of discrimination.

### 2. Discrimination Based on Sexual Orientation under Title IX

Cruz alleges that Defendants' conduct constitutes discrimination based on sexual orientation under § 1681.[4] (Compl. ¶¶ 31-33.) Cruz's claim lacks merit. Section 1681(a) provides that "[n]o person in the United States shall, on the basis of sex, be excluded from

---

[4] Plaintiff's brief does not address this claim or his claim alleging that Defendants violated the NJFHA and the FHA.

participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . ." 20 U.S.C. § 1681(a) (emphasis added).  Although Title IX prohibits discrimination "on the basis of sex" in the school context, the clear language of the statute indicates that it does not protect sexual orientation.  See id.; see also Tyrrell v. Seaford Union Free Sch. Dist., 792 F. Supp. 2d 601, 622 (E.D.N.Y. 2011) ("Sexual orientation is not a protected class under . . . Title IX.").

Additionally, courts often look to Title VII law for guidance when considering discrimination under Title IX.  See Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 617 n.1 (1999).  In Bibby v. Phila. Coca Cola Bottling Co., the Third Circuit rejected a claim for discrimination based on sexual orientation under Title VII.  260 F.3d 257 (3d Cir. 2001).  The court concluded that "[i]t is clear . . . that Title VII does not prohibit discrimination based on sexual orientation."  Id. at 261; see also Prowel v. Wise Bus. Forms, Inc., 579 F.3d 285, 290 (3d Cir. 2009) ("Despite acknowledging that harassment based on sexual orientation has no place in just society, [we recognize] that Congress chose not to include sexual orientation harassment in Title VII.").

### 3. Discrimination Based on Sexual Orientation under NJFHA and the FHA

Cruz asserts that Defendants' actions were in violation of NJFHA and the FHA.  (Compl. ¶¶ 34-37.)  These claims lack merit.  NJFHA provides in relevant part that "every municipality in a growth area has a constitutional obligation to provide through its land use regulations a realistic opportunity for a fair share of its region's present and prospective needs for housing low and moderate income families."  N.J. Stat. Ann. § 52:27D-302(a) (emphasis added).  NJFHA is inapplicable to Defendants.  The statute addresses a municipality's responsibility to provide housing to low and moderate income families.  See id.  SHU is not a municipality; it is a private

institution of higher education. Moreover, Cruz's claim of discrimination based on sexual orientation is not within the purview of the statute, the purpose of which is to provide affordable housing to low and moderate income families. Toll Bros. v. Twp. of W. Windsor, 173 N.J. 502, 511 (2002).

Similarly, Cruz has no claim under the FHA. The FHA provides in relevant part that "it shall be unlawful--To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b) (emphasis added). Discrimination based on sexual orientation is not protected under the FHA. See Smith v. Mission Assocs. L.P., 225 F. Supp. 2d 1293, 1299 (D. Kan. 2001) ("Sexual orientation claims are not actionable under the FHA."); Neithamer v. Brennenman Prop. Servs., Inc., 81 F. Supp. 2d 1, 4 (D.D.C. 1999) (observing that the FHA does not prohibit discrimination based on sexual orientation).

### 4. Breach of Contract

Plaintiff asserts that SHU breached its own policies regarding housing and room changes because it asked him to move solely because of his sexual orientation. Cruz's breach of contract claim has no merit. In Romeo, the court was confronted with a similar issue. The plaintiff alleged that SHU's "antidiscrimination policy . . . create[d] a unilateral contract." 378 N.J. Super. at 392. The Appellate Division concluded that Mittra v. Univ. of Med. & Dentistry of N.J., 316 N.J. Super. 83 (App. Div. 1998), is the appropriate standard to apply in determining whether a university's antidiscrimination policy constitutes a contract. Romeo, 378 N.J. Super. at 393. In Mittra, the court observed that "the relationship between the university and its students should not be analyzed in purely contractual terms. As long as the student is afforded

reasonable notice and a fair hearing in general conformity with the institution's rules and regulations, we defer to the university's broad discretion." 316 N.J. Super at 85. Following Mittra, the court held that "[a] contractual relationship cannot be based on isolated provisions in a student manual." Romeo, 378 N.J. Super. at 395. Therefore, the License Agreement is not a contract and Defendants' alleged failure to follow some of its provisions does not amount to a breach of contract.

Furthermore, although Cruz bases his breach of contract claim on a provision in the Licensing Agreement, he ignores the fact that there is another provision in that Licensing Agreement which provides that SHU "[r]eserves the right to move a Resident from one room to another when the University determines, in its sole and absolute discretion that the move is in the Resident's best interest or those of his/her fellow students and/or the University's." (Hart Decl. Ex. A ¶ 6.) Hence, pursuant to the License Agreement, SHU was well within its rights to relocate Cruz or any other student.

Finally, this Court has already determined that SHU's decision to move Cruz and his roommate into different rooms was not based on Cruz's sexual orientation. In fact, Plaintiff never moved from his room. Consequently, he has no basis for a breach of contract claim.

**5. Negligent Hiring, Training, Supervision and Retention**

SHU maintains that it is immune from negligent liability under the New Jersey Charitable Immunity Act ("NJCIA"), N.J. Stat. Ann. § 2A:53A-7(a). The NJCIA "provides immunity from tort liability where the entity being sued: (1) is a non-profit corporation; (2) is organized exclusively for religious, charitable or educational purposes; and (3) was advancing those purposes 'at the time of the injury to plaintiff who was then a beneficiary of the charitable works.'" Nazarro v. U.S., 304 F. Supp. 2d 605, 610 (D.N.J. 2004) (quoting Bieker v. Cmty.

House of Moorestown, 169 N.J. 167, 175 (2001)).  The New Jersey Appellate Division has established that SHU is a nonprofit, religiously-affiliated university that is entitled to charitable immunity, thus satisfying both prongs one and two.  Bloom v. Seton Hall University, 307 N.J. Super. 487, 492-93 (App. Div. 1998), certif. denied, 153 N.J. 405 (1998); see also Orzech v. Fairleigh Dickinson University, 411 N.J Super. 198, 205 (App. Div. 2009) (noting that the first two prongs of NJCIA were clearly satisfied because the university was formed for nonprofit purposes and organized exclusively for educational purposes).  Prong three is satisfied since a student of a college fits within the framework of a beneficiary of the college.  O'Connell v. State, 171 N.J. 484, 490 (2002).

Cruz, relying on Presbyterian Homes of Synod of N.J. v. Div. of Tax Appeals, 55 N.J. 275 (1970), maintains that SHU is not entitled to immunity because it does not satisfy all three prongs.  (Pl.'s Opp'n Br. 13-14.)  Plaintiff's reliance on Presbyterian Homes is misplaced.  Cruz asserts that SHU and Presbyterian Homes are similar because both institutions are not obligated "to provide services to people who are not financially equipped to pay its tuition" and are thus not operating for "charitable purposes."  (Id.)  As Defendants correctly point out, Plaintiff's reliance on the phrase "charitable purposes" is misguided because SHU is a nonprofit religious institution organized for educational purposes.  (Defs.' Br. 19-20.)  As stated earlier, the Bloom Court established that SHU is an organization that is covered under the NJCIA.  307 N.J. Super. at 492.  Therefore, the exemption applies to SHU and it is immune from claims alleging negligence.

**6. Negligent and Intentional Infliction of Emotional Distress**

### a. Negligent Infliction of Emotional Distress

In New Jersey, a plaintiff may maintain an action for negligent infliction of emotional distress under two scenarios. First, "[a] plaintiff can demonstrate that the defendant's negligent conduct placed the plaintiff in reasonable fear of immediate personal injury, which gave rise to emotional distress that resulted in a substantial bodily injury or sickness." Jablonowska v. Suther, 195 N.J. 91, 104 (2008). Alternatively, a plaintiff can maintain an action for negligent infliction of emotional distress by satisfying the four elements set forth in Portee v. Jafee, 84 N.J. 88, 101 (1980). These elements are:

> (1) the defendant's negligence caused the death of, or serious physical injury, to another; (2) the plaintiff shared a marital or intimate, familial relationship with the injured person; (3) the plaintiff had a sensory and contemporaneous observation of the death or injury at the scene of the accident; and (4) the plaintiff suffered severe emotional distress.

Jablonowska, 195 N.J. at 103 (citing Portee, 84 N.J. at 97, 101).

Here, Plaintiff has not provided any evidence demonstrating that Defendants were negligent. As stated earlier, the record indicates that Eusebio attempted to resolve the conflict between Cruz and Crisci. Furthermore, Plaintiff has not alleged any facts or presented any evidence that would satisfy the elements set forth in Portee. Moreover, Defendants are immune from liability under NJCIA. Consequently, Cruz's claim for negligent infliction of emotional distress fails.

### b. Intentional Infliction of Emotional Distress

To succeed on a claim of intentional infliction of emotional distress under New Jersey law, "a plaintiff must claim that (1) the defendant intended to cause emotional distress; (2) the conduct was extreme and outrageous; (3) the actions proximately caused emotional distress; and (4) the emotional distress was severe." Acevedo v. Monsignor Donovan High Sch., 420 F. Supp.

14

2d 337, 348 (D.N.J. 2006). "Mere allegations of aggravation, embarrassment, an unspecified number of headaches, and loss of sleep are insufficient as a matter of law to support a finding of severe mental distress that no reasonable person could be expected to endure." Turner v. Wong, 363 N.J. Super. 186, 200 (App. Div. 2003) (internal citation and quotation marks omitted).

Plaintiff, relying on Seiderman v. American Institute for Mental Studies, 667 F. Supp. 154 (1987), contends that charitable immunity does not extend to negligent and intentional infliction of emotional distress involving "gross negligence or wanton or willful conduct." (Pl.'s Opp'n Br. 14) (internal quotation marks omitted). Cruz concedes that Defendants "did not physically force [him] to sleep somewhere else[; however, he maintains that] they intentionally made [him] feel . . . alienated and uncomfortable . . . to sleep in his originally assigned room." (Id. at 10.) Plaintiff asserts that he experiences "crying spells, constant stomach aches, nausea, and heart palpitations" as a result of the alleged discrimination. (Nicholas Decl. Ex. A, Cruz Certif. ¶ 31).

Plaintiff also supports his claim of emotional trauma with a report by Joanie Arnold,[5] ("Arnold"), a social worker. Arnold's report, which is based on a single session with Cruz, concludes that Cruz's "inability to cope with the stress of the incident with [SHU] is manifesting as depression, excessive anxiety, disrupted sleep pattern, nightmares, heart palpitations, flashbacks, avoidant behavior, anger, irritability, lack of concentration and hopelessness and helplessness." (Pl.'s Opp'n Br. 16.) Arnold contends that Cruz's emotional state is a direct result of Defendants' actions. (Nicholas Decl. Ex. L.) Additionally, though Plaintiff claims he suffers from these psychological and physical symptoms, he concedes that he has not consulted

---

[5] Cruz's attorney, who is related to Arnold, recommended her services to Cruz. (Sponzilli Decl. Ex. A, Cruz Dep. 170:12-13, 168:21-170-3.)

any doctor, psychologist, psychiatrist or counselor other than Arnold and his family physician. (Sponzilli Decl. Ex. A, Cruz Dep. 182:11-189:12.)

This Court is not persuaded by Cruz's arguments. First, Cruz's reliance on Seiderman is misplaced. In Monaghan v. Holy Trinity Church, the New Jersey Appellate Division stated that Seiderman "is not binding upon our state courts." 275 N.J. Super. 594, 599 (App. Div. 1994). Additionally, the Appellate Division criticized and rejected the decision and noted that

> [t]he Seiderman [C]ourt failed to consider the history of actions taken by the New Jersey Legislature and drew incorrect conclusions by relying upon decisions of New Jersey courts interpreting judicially-granted immunities. Since New Jersey's law on charitable immunity is mandated by statute, the Seiderman analysis is faulty and we disapprove the decision.

Id. at 600.

Second, this Court has already determined that Defendants did not discriminate against Cruz on the basis of his sexual orientation. Therefore, Plaintiff's allegations that he was discriminated against cannot be a basis for finding intentional infliction of emotional distress.

Third, Cruz has not established that Defendants' conduct was outrageous or "so extreme in degree, as to go beyond all possible bounds of decency, and . . . be regarded as atrocious, and utterly intolerable in a civilized community." Buckley v. Trenton Sav. Fund Soc'y, 111 N.J. 355, 366 (1988). The record shows that Defendants attempted to resolve the dispute and offered support to Plaintiff.

Fourth, Plaintiff has failed to demonstrate that his distress was severe. In Lascurain v. City of Newark, the plaintiff claimed her distress was severe because she was nauseous, upset, depressed, and no longer able to enjoy every day activities. 349 N.J. Super 251, 280-81 (App. Div. 2002). However, at her deposition, she admitted that her alleged emotional distress did not affect her daily routine. The court found that her distress was not severe because there was no

16

dramatic impact on her daily routine and she did not seek regular therapeutic counseling. Id.; see also Buckley, 111 N.J. at 369 (holding that the plaintiff could not recover for his emotional distress because he did not claim any interference with his daily routine).

Similar to the plaintiffs in Lascurain and Buckley, Cruz testified that during and after the incident he continued to engage in his daily activities such as going to classes, working, and "hanging out" with his friends. (Sponzilli Decl. Ex. A, Cruz Dep. 61:17-62:2.) He also testified that he was still involved in extracurricular activities at school and he joined other student organizations in his junior year. (Id. at 62:3-9.) In fact, his grades improved after the incident. Furthermore, although Plaintiff asserts that he gets upset every time he walks by Xavier Hall, (id. at 191:20-192:11, 194:1-5), he continued to live in room 346 at Xavier Hall after the incident and for the duration of the 2010-2011 school term. Moreover, other than the one visit with Arnold and a visit to his family doctor, Cruz did not seek additional medical consultation. Accordingly, Plaintiff has failed to establish that he has suffered severe distress and Defendants are entitled to summary judgment.

**CONCLUSION**

For the reasons stated above, Defendants' Motion is **GRANTED**.

                                        s/Susan D. Wigenton, U.S.D.J.

cc: Madeline Cox Arleo, U.S.M.J.